## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 25 2020, 9:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Yvonne M. Spillers
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of C.P. and O.P. (Minor Children); | March 25, 2020 |
| | Court of Appeals Case No. 19A-JT-2379 |
| R.P. (Father), | |
| *Appellant-Respondent,* | Appeal from the Wells Circuit Court |
| v. | The Honorable Kenton W. Kiracofe, Judge |
| Indiana Department of Child Services, | Trial Court Cause Nos. 90C01-1811-JT-56 90C01-1811-JT-57 |
| *Appellee-Petitioner.* | |

**Najam, Judge.**

# Statement of the Case

R.P. ("Father") appeals the trial court's termination of his parental rights over his minor children C.P. and O.P. ("Children"). Father presents a single issue for our review, namely, whether the Indiana Department of Child Services ("DCS") presented sufficient evidence to support the termination of his parental rights. We affirm.

# Facts and Procedural History

Father and A.P. ("Mother") (collectively "Parents") have two children together: C.P., born November 13, 2015, and O.P., born October 12, 2016. On December 29, 2016, when O.P. was eleven weeks old, DCS received a report that Children were the victims of physical abuse. The Family Case Manager ("FCM") who investigated the report went to Parents' home and found it "in substandard condition with dirty diapers and clutter throughout." Appellant's App. Vol. 2 at 31. Father became "extremely defensive" and was "verbally aggressive toward the FCM." *Id.* On January 4, 2017, DCS removed Children from Parents' care, and on January 5, DCS filed petitions alleging Children were CHINS. On January 9, the State charged Father with battery, as a Level 5 felony, for harming O.P.

On April 24, after Parents admitted that Children were CHINS, the court found Children to be CHINS and entered a dispositional order. In particular, the court ordered Father to: participate in home-based therapy and follow all recommendations; complete a psychological evaluation and follow all

recommendations; not commit acts of domestic violence; participate in a domestic violence assessment program; and attend supervised visits with Children. Father was "partially compliant" in that "he attended (although did not complete) the Center for Nonviolence [program,] and he submitted himself to a psychological assessment." Appellant's Br. at 13. In September, Father pleaded guilty to battery, as a Level 6 felony, and he was sentenced to 545 days, with all but forty-four days suspended. In addition, Father was ordered to have no contact with O.P. for the duration of his suspended sentence.

[4] In November 2018, DCS filed petitions to terminate Father's parental rights over Children.[1] Following a hearing, the trial court granted the termination petitions on August 2, 2019. In support of its order, the trial court entered the following relevant findings:

> 15. Father has criminal history that demonstrates a propensity for violence and disobedience of the law. Father has been convicted of the following offenses:
>
>> a. Burglary Break and Enter Structure of Another Person (State's Exhibit 11).
>>
>> b. Battery (State's Exhibits 20-21);
>>
>> c. Driving While Suspended (State's Exhibits 1-2; 4-6; 7-8; 22-30); and

---

[1] Mother voluntarily terminated her rights over Children.

d. Battery on a Person Less Than 14 Years Old (State's Exhibit[s] 12-19).

16. Father has three instances of substantiated allegations of sexual abuse. The first occurred in 2009 when Father was a juvenile. The victims were ten (10) year-old, seven (7) year-old, and five (5) year-old boys. The second occurrence was in 2011 when Father was eighteen (18) years old. The victim in that case was a fifteen (15) year-old girl. Finally, in 2018, Father was substantiated against again; the victim was a thirteen (13) year-old girl.

17. Father submitted to a diagnostic evaluation performed by Jinny Broderick of Park Center (State's Exhibit 59). Father was diagnosed with the following:

a. Other Specified Disruptive, Impulse Control, and Conduct Disorder;

b. Child Psychological Abuse, Encounter for mental health service for perpetrator of parent-child psychological abuse; and

c. Child Physical Abuse; Encounter for mental health services for perpetrator of parental child abuse.

18. The evaluation recommended that Father complete a certified batterer's intervention program and meet with a neurologist for an evaluation regarding his head injury to determine what, if any, effect this has on his ability to manage frustrations for such anger and resulting impulsive actions.

19. Father gave Jinny Broderick minimal information during the evaluation, appeared annoyed at the evaluation, and was aggressive in his language when speaking of FCM Garrett.

20. During the evaluation, Father stated that he did not believe he had done anything wrong nor was he inappropriate in parenting his children. He did not believe that you can verbally abuse a child and that there was no abuse absent marks or bruises.

21. Jinny Broderick believed that Father appeared grandiose, had rigid thinking, blamed others, and was pre-contemplative.

22. Father submitted to a psychological evaluation provided by Charles Rohr, Psy.D, on November 11, 2017 and December 7, 2017. Father was diagnosed with the following:

    a. Child Psychological Abuse;

    b. Child Physical Abuse;

    c. Antisocial Personality Disorder;

    d. Paranoid Personality Disorder; and

    e. Mild Neurocognitive Disorder Due to Traumatic Brain Injury, with Behavioral Disturbance: mood disruptions, agitation, impaired executive function.

23. Father has not participated in a neurological evaluation to address any physical injury to his brain that might contribute to his mental health issues.

24. Father has not participated in individual therapy as recommended.

25. Father has never participated in mental health services as recommended by the psychological evaluation and the Center for Non-Violence.

26. On January 24, 2018, Father initiated services at the Center for Non-Violence and began attending sessions; however, on June 9, 2018, Father was expelled from the program.

27. Brandon Evans, the Center for Non-Violence Men's Program Senior Coordinator, explained that Father had been expelled from the program for inappropriate behavior. Evans stated, "When confronted about an act of violence against a former coworker, he [Father] became angry, defensive, and argumentative."

28. Further, "[Father] stated 'I'll take care of Wendy (his DCS caseworker) and him (referring to the coworker in question).'" Finally, Evans stated, "Lastly, he attempted to discredit staff in the eyes of other group members by saying, 'Don't trust him,' while pointing his finger at the facilitator and speaking to another participant." (State's Exhibit 58).

29. Father has battered Mother on multiple occasions. On one occasion, Mother received a bruised lip when Father smashed her face into the concrete. (State's Exhibit 57).

30. Mother has witnessed Father being verbally aggressive toward the children on multiple occasions.

31. At the time of the fact-finding hearing, Mother and Father were no longer in a relationship.

32. Mother has consented to the adoption of the children by the current placement, the maternal grandmother.

33. The children are bonded with each other and their maternal grandmother.

34. The children have been removed from Father's care for twenty-seven (27) months, which is nearly the entirety of the youngest child's life.

35. The Department's plan for the children is that they be adopted by their maternal grandmother. The Department will continue to provide for the placement, care, and treatment of the children until such time as they are adopted.

36. The guardian ad litem is satisfied with the DCS' plan for the children.

Appellant's App. Vol. 2 at 32-35. This appeal ensued.

# Discussion and Decision

## *Standard of Review*

Father contends that the trial court erred when it terminated his parental rights. We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
>> (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2019).  DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses.  *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*.  Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment.  *Id.*  Moreover, in deference to the trial

court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[8] Here, in terminating Father's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[9] On appeal, Father contends that the trial court erred when it concluded that: (1) the conditions that resulted in Children's removal and the reasons for their placement outside of his home will not be remedied; (2) there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of Children; and (3) termination is in Children's best interests. However, as Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not address the issue of whether there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of Children.

Initially, Father asserts that the court improperly admitted evidence "about facts and circumstances that occurred while Father was a juvenile, from other CHINS actions involving other children, and about Father's criminal history." Appellant's Br. at 12. And he maintains that that evidence "influenced and formulated the basis of the Order being appealed." *Id.* However, Father does not direct us to portions of the transcript showing that he objected to that evidence, other than a single objection to testimony regarding his molestation of three minor boys in 2009 when Father was also a minor. *See* Tr. Vol. 2 at 62. Accordingly, other than the testimony regarding the 2009 incidents, Father has waived this issue for our review. And, while the trial court mentioned the 2009 offenses in one finding, there is ample independent evidence to support the termination of Father's parental rights absent that evidence, and the error, if any, would be harmless. *See In re Termination of Parental Rights of E.T.*, 808 N.E.2d 639, 646 (Ind. 2004) (holding improper admission of evidence harmless error where substantial independent evidence supported judgment). Finally, there is no question that Father's criminal history was relevant to the termination proceeding. Father's contention on this point is not well taken.

### *Reasons for Children's Placement Outside of Father's Home*

Father contends that DCS did not present sufficient evidence to prove that the reasons for Children's placement outside of his home will not be remedied. This court has clarified that, given the wording of the statute, it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also any basis

resulting in the continued placement outside of a parent's home. *Inkenhaus v. Vanderburgh Cty. Off. of Fam. & Child. (In re A.I.)*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Here, the trial court properly considered the conditions leading to the continued placement outside of Father's home, including Father's history of domestic abuse, especially the battery of O.P. The court observed that Father did not participate in mental health services that were recommended following his psychological evaluation, and he "refuses to address his aggressive personality." Appellant's App. Vol. 2 at 36.

[12] We hold that the evidence supports the trial court's findings and conclusion. To determine whether there is a reasonable probability that the reasons for Children's continued placement outside of Father's home will not be remedied, the trial court should judge Father's fitness to care for Children at the time of the termination hearing, taking into consideration evidence of changed conditions. *See E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

[13] The trial court found, and the evidence supports, that: Father has a criminal history "that demonstrates a propensity for violence and disobedience of the law"; Father "did not believe he had done anything wrong nor was he inappropriate in parenting his children"; and Father was "expelled" from the Non-Violence Men's Program "for inappropriate behavior." Appellant's App. Vol. 2 at 32-34. Father's argument on appeal is simply an invitation for this Court to reweigh the evidence and judge the credibility of the witnesses, which we cannot do. Based on the totality of the circumstances, we hold that the trial court's findings support its conclusion that the conditions that resulted in Children's removal and the reasons for their placement outside of his home will not be remedied.

### Best Interests

[14] Father also contends that the trial court erred when it concluded that termination of his parental rights is in Children's best interests. In determining what is in a child's best interests, a juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *A.S. v. Ind. Dep't of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010). A parent's historical inability to provide "adequate housing, stability, and supervision," in addition to the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the child. *Id*.

[15] When making its decision, the court must subordinate the interests of the parents to those of the child. *See Stewart v. Ind. Dep't of Child Servs. (In re J.S.)*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). "The court need not wait until a

child is irreversibly harmed before terminating the parent-child relationship." *Id*. Moreover, this Court has previously held that recommendations of the family case manager and court-appointed advocate to terminate parental rights, coupled with evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id*.

[16] Father asserts that "his serious head injury interfered with his ability to complete services" and that "he should have been given more time to get a neurological assessment and a treatment plan which could help him control his behaviors before terminating his parental rights." Appellant's Br. at 14. But Father ignores the fact that he had two years from the time DCS filed the CHINS petitions until the final hearing to seek a diagnosis and treatment. He gives no explanation why two years was not enough time to be assessed and participate in appropriate treatment for his alleged head injury.

[17] As the trial court's findings demonstrate, Father has not shown that he is capable of parenting Children. Father did not participate in most of the court-ordered services, and, because of his battery against O.P., a no-contact order prevented parenting time. Children have lived with their maternal grandmother since January 2017, which is a pre-adoptive home, and they are bonded and thriving. The family case manager recommended termination of Father's parental rights. Given the totality of the evidence, Father cannot show that the trial court erred when it concluded that termination of his rights was in Children's best interests.

[18] Affirmed.

Kirsch, J., and Brown, J., concur.